Case No. 22-14324

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

RICHARD HICKS and JOCELYN HICKS,
Appellants-Plaintiffs,

v.

GREGORY MIDDLETON, JOHN DOE 1, and MARINE TERMINALS
CORPORATION – EAST, d/b/a PORTS AMERICA,
Appellees-Defendants.

---

Appeal from the United States District Court
for the Southern District of Georgia

## Appellants-Plaintiffs Richard Hicks And Jocelyn Hicks' Principal Brief

Naveen Ramachandrappa
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW, Ste 3900
Atlanta, GA 30309
404-881-4100

Brent J. Savage
Zachary R. Sprouse
James H. Wilson, III
SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE
102 E. Liberty Street, 8th Floor
P.O. Box 10600
Savannah, GA 31412
(912) 231-1140

*Attorneys for Appellants-Plaintiffs*
*Richard Hicks and Jocelyn Hicks*

Case No. 22-14324
Richard Hicks v. Gregory Middleton

## <u>Amended Certificate Of Interested Persons And Corporate Disclosure Statement</u>

On January 10, 2023, Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks filed their Certificate Of Interested Persons And Corporate Disclosure Statement. After that date, two attorneys—Michael P. Freed and Elissa Haynes—appeared as new, additional counsel of record for Appellee-Defendant Marine Terminals Corporation - East, d/b/a Ports America. *See* Jan. 17, 2023 Appearance of Counsel [Doc. 9]; Jan. 17, 2023 Appearance of Counsel [Doc. 10].

Thus, pursuant to Eleventh Circuit Rule 26.1-4, the Hickses now submit this Amended Certificate Of Interested Persons And Corporate Disclosure Statement. This Amended Certificate adds only two new names—Michael P. Freed and Elissa Haynes—and makes no other changes to the Certificate filed on January 10, 2023.

The Hickses' counsel certify that the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party) that have an interest in the outcome of this particular case or appeal:

- Baker, Hon. R. Stan (District Court Judge, S.D. Ga.)

Case No. 22-14324
Richard Hicks et al. v. Gregory Middleton et al.

- Bardack, Marc H. (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Bondurant, Mixson & Elmore LLP (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP (Counsel for Defendant Gregory Middleton)

- Ellis, Painter, Rattertree, & Adams LLP (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Freed, Michael P. (Consel for Appellee-Defendant Marine Terminals Corporation - East)

- Freeman, Mathis & Gary, LLP (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Grant, R. Russell II (Counsel for Defendant Gregory Middleton)

- Haynes, Elissa (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Hicks, Jocelyn (Appellant-Plaintiff)

- Hicks, Richard (Appellant-Plaintiff)

- Lee, Joy (Counsel for Defendant Gregory Middleton)

Case No. 22-14324
Richard Hicks et al. v. Gregory Middleton et al.

- Marine Terminals Corporation – East, d/b/a Ports America (Appellee-Defendant)

- Middleton, Gregory (Defendant)

- Pedigo, Jason Carl (Counsel for Appellee-Defendant Marine Terminals Corporation – East)

- Ports America Terminals, Inc. (100% owner and parent corporation of Appellee-Defendant Marine Terminals – East)

- Ramachandrappa, Naveen (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Ray, Hon. Christopher L. (Magistrate Judge, S.D. Ga.)

- Savage, Brent J., Sr. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Savage, Turner, Pinckney, Savage & Sprouse (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Sprouse, Zachary R. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Terrett, Craig P. (Counsel for Defendant Gregory Middleton)

Case No. 22-14324
Richard Hicks et al. v. Gregory Middleton et al.

- Thompson, Philip M. (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Wilson, James H. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks further certify that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## Statement Regarding Oral Argument

This appeal arises from a civil tort action brought under Georgia law by Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks (the "Hickses") against Appellee-Defendant Marine Terminals Corporation - East, d/b/a Ports America ("Ports America") and Defendant Gregory Middleton ("Middleton"). On November 7, 2020, Middleton negligently drove his pickup truck, while inside the Port of Savannah, Garden City Terminal (the "Port"), and struck Mr. Hicks with the pickup truck. Because of Mr. Hicks's nearly fatal injuries, the Hickses assert negligence claims against Middleton and vicarious liability claims against Ports America based on *respondeat superior*. The district court, however, granted summary judgment in Ports America's favor. The issues on appeal involve whether Middleton was acting within the scope of his employment with Ports America.

For at least four reasons, the Hickses request oral argument.

*First*, no reported Georgia case appears to address a primary legal question in this appeal: For the going-and-coming rule that says an employee's commute is not within the scope of employment, where precisely does an employee's commute end? Given the absence of binding Georgia precedent on this question, the Court will have to consider the underlying reasons for the rule in order to decide whether Middleton's commute ended once he was inside the Port or whether his commute continued until he reached the ship to which he was assigned. Oral argument may

i

assist the Court in better understanding the reasons for the going-and-coming rule, and its application to multi-acre job sites like the Port. *Cf. Rose v. Hodges*, 423 U.S. 19, 26 (1975) (Brennan, J., dissenting) ("[I]mportantly, the issue is one of first impression in this Court, and it surely merits briefing and oral argument.").

*Second*, the question of where precisely an employee's commute ends is not only a question of first impression, but it is one that also affects tens of thousands of workers and employers across Georgia. At the Port alone, the local union, International Longshoreman's Association Local 1414, has at least 1,269 members, and their "numbers are skyrocketing." R-67 (Mosley Dep.) at 28.[1] In fact, "[t]he Port of Savannah ... [is] the number one single operating port in the United States right now." *Id.*; *see also* https://www.unionfacts.com/lu/9926/ILA/1414/.

Of course, the Port is not the only large job site in Georgia. Many of the world's largest airports, stadiums, warehouses, manufacturing sites, and corporate headquarters are in Georgia, and the tens of thousands of workers and employers at these multi-acre job sites will be affected by the Court's decision here. Given the important stakes, oral argument may help ensure the Court does not overlook any arguments or evidence. *Cf. Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (Stevens, J., dissenting) ("Whenever this Court acts summarily, there is

---

[1] Pursuant to Eleventh Circuit Rule 28-5, the Hickses state that this principal brief and any others they file will use the following format: R-[district court docket number] (abbreviated name of the document, if needed for context) at [page number(s) in the header generated by the district court's electronic filing system].

an increased risk that it will make a mistake. Without the benefit of full briefs and oral argument, an important issue may escape our attention.").

*Third*, in addition to presenting important questions of first impression, the facts here are far more complicated than the ordinary motor vehicle case. Among other things, the witnesses—mostly dock workers—use a wide variety of different terminology that can be difficult to follow, even for the dock workers themselves. *See, e.g.*, R-67 (Mosley Dep.) at 71 ("A. .... I keep reading this and it keeps saying game plan. But it's not game plan. It's gang."); *id.* at 71-72 ("A. Just like they say latcher. It's not a latcher. Q. A lasher. A. It's a lasher."); *id.* at 72 ("Q. I'm not sure all of the longshore-persons have it right. A. They don't."); R-66 (Middleton Dep.) at 78-79 ("Q. .... I'm getting lost in my terminology here."). There are also detailed terminal maps and surveillance video regarding Middleton's travel inside the Port. And as even the district court found, the testimony of the most important witness, Middleton, "was by no means crystal clear," "he frequently offered self-contradictory testimony," and he is often "confusing." R-95 (MSJ Order) at 5.

Given these complicated facts, oral argument would allow the lawyers to help the Court more effectively understand the record. *Cf. Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 875 (8th Cir. 2005) ("We expect, particularly in complicated, fact-intensive cases, that counsel will aid our understanding of the record ....").

*Fourth*, in the district court, the Hickses made a meaningful, four-page

request for oral argument, including with supporting argument and citations of authority. *See* Doc. 93 [Pls.' Mot. & Req. for Oral Hearing] at 1-4. The district court denied that request and otherwise did not hold any oral hearings in this action. Given the severe and nearly fatal injuries that Mr. Hicks suffered, oral argument would not only be helpful in ensuring the Court reaches the right result, but it would also help ensure that the parties receive the procedural justice that comes with oral argument. That is, given the stakes, being quite literally *heard* by the Court is important to the parties' sense of justice and having one's day in court.

For those reasons, the Hickses ask that the Court grant oral argument.

# **Table Of Contents**

Amended Certificate Of Interested Persons.............................................................C-1

Statement Regarding Oral Argument ....................................................................... i

Table Of Citations .................................................................................................. vii

Statement Of Jurisdiction........................................................................................ ix

Statement Of The Issues ...........................................................................................1

Statement Of The Case .............................................................................................1

    1.     Statement Of The District Court Proceedings......................................2

    2.     Statement Of The Facts ........................................................................3

           A.     Ports America hires dock workers out of ILA 1414's union hall, one hour before the start of on-ship duties. .............3

           B.     After being hired, dock workers must commute from the union hall to the Port and drive their personal vehicle through security................................................................................6

           C.     Once inside the Port, Ports America requires dock workers to perform certain pre-ship duties to prepare for on-ship duties. ............................................................................7

           D.     After completing their pre-ship duties, dock workers begin on-ship duties, one hour after being hired. ......................9

           E.     On November 7, 2020, while driving his pickup truck inside the Port and performing one of his pre-ship duties, Middleton negligently struck Mr. Hicks with the truck. ...........9

    3.     Statement Of The Standard Of Review...............................................13

Summary Of The Argument ....................................................................................13

Argument And Citations Of Authority ....................................................................13

    1.    A jury could properly find that Middleton's commute ended once he was inside the Port and, thus, he was within the scope of employment....................................................................15

    2.    Even if Middleton's commute continued inside the Port, a jury could properly find that, because he was driving to a dock house to get game plans, he was within the scope of employment. .........................................................................21

    3.    Even if Middleton went to the wrong dock house, a jury could properly find that he was within the scope of employment. ...............25

Conclusion ..............................................................................................29

## <u>Table Of Citations</u>

**Federal Cases**

*Baldwin Cty. Welcome Ctr. v. Brown*,
    466 U.S. 147 (1984)....................................................................... ii

*Flohr v. Mackovjak*,
    84 F.3d 386 (11th Cir. 1996) .........................................................14

*Okruhlik v. Univ. of Ark.*,
    395 F.3d 872 (8th Cir. 2005) ......................................................... iii

*Rose v. Hodges*,
    423 U.S. 19 (1975)......................................................................... ii

*Strickland v. Norfolk S. Ry. Co.*,
    692 F.3d 1151 (11th Cir. 2012) .....................................................13

**Georgia Cases**

\*   *Clo White Co. v. Lattimore*,
    590 S.E.2d 381 (Ga. Ct. App. 2003) .....................................14, 19, 22, 23, 24

*Coe v. Carroll & Carroll, Inc.*,
    709 S.E.2d 324 (Ga. Ct. App. 2011) ......................................14, 28

*Davis Gas Co. v. Powell*,
    232 S.E.2d 258 (Ga. Ct. App. 1976) ......................................26, 28

*Hunter v. Modern Con'l Constr. Co.*,
    652 S.E.2d 583 (Ga. Ct. App. 2007) ..............................................24

*Jones v. Aldrich Co., Inc.*,
    373 S.E.2d 649 (Ga. Ct. App. 1988) ......................................15, 21

*Jump v. Anderson*,
    197 S.E. 644 (Ga. Ct. App. 1938).................................................14

\*    *Patterson v. Se. Newspapers, Inc.*,
      533 S.E.2d 119 (Ga. Ct. App. 2000) ................................................19, 22, 24

*Remediation Res., Inc. v. Balding*,
      635 S.E.2d 332 (Ga. Ct. App. 2006) ...........................................................14

*S. Grocery Stores v. Herring*,
      11 S.E.2d 57 (Ga. Ct. App. 1940)................................................................28

*Smith v. CSX Transp., Inc.*,
      751 S.E.2d 604 (Ga. Ct. App. 2013) ...........................................................19

**Other State Cases**

\*    *Haco Drilling Co. v. Burchette*,
      364 P.2d 674 (Okla. 1961)....................................................................24, 25

*Huntsinger v. Glass Containers Corp.*,
      99 Cal. Rptr. 666 (Cal. Ct. App. 1972).......................................................22

*Jeewarat v. Warner Bros. Entm't Inc.*,
      98 Cal. Rptr. 3d 837 (Cal. Ct. App. 2009)...................................................15

*Jones v. Blair*,
      387 N.W.2d 349 (Iowa 1986).....................................................................15

**Federal Statutes**

28 U.S.C. § 1291.........................................................................................................x

28 U.S.C. § 1332........................................................................................................ix

**Georgia Statutes**

O.C.G.A. § 52-2-1.......................................................................................................4

## Statement Of Jurisdiction

The Court has subject-matter and appellate jurisdiction to decide Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks' appeal from the district court's summary judgment for Appellee-Defendant Marine Terminals Corporation - East, d/b/a Ports America, holding that Defendant Gregory Middleton was not acting within the scope of his employment with Ports America at the time of injury.

The Court has subject-matter jurisdiction because the opposing parties to this action have diverse citizenship and the amount in controversy meets the required amount. *See* 28 U.S.C. § 1332 (a); R-1 (Removal Not.) ¶ 8. As to citizenship, the Hickses reside in and are citizens of the State of Georgia. R-1 (Removal Not.) ¶ 8-9. On the other side, Middleton resides in and is a citizen of the State of South Carolina, *id.* ¶ 10; and Ports America is a citizen of the State of California, where it is incorporated, and the State of New Jersey, where it has its principal place of business, *Id.* ¶ 11. As to the amount in controversy, "Mr. Hicks suffered 'a fractured skull with a brain bleed, broken neckbone and dislocated and separated shoulder," and his "hospitalization/rehabilitation" has been "extensive." *Id.* ¶ 16. "Claims for serious injuries and permanent impairment are routinely compensated at levels far in excess of $75,000.00." *Id.* ¶ 18.

This Court has appellate jurisdiction because, although the district court's summary judgment in Ports America's favor did not resolve the Hicks es' claims

against Middleton, the district court certified its summary judgment under Rule 54 (b) of the Federal Rules of Civil Procedure. *See* R-104 at 4 ("The Court finds that, in this case, there is no just reason for delay and **GRANTS** the Motion for Entry of Final Judgment, (doc. 96)."). Pursuant to that certification, on December 2, 2022, the district court entered final judgment in Ports America's favor. *See* R-105 at 1. And on December 28, 2022, the Hickses timely filed a notice of appeal from the district court's final judgment. *See* R-106; 28 U.S.C. § 1291.

## Statement Of The Issues

This appeal presents the following three issues:

(1)    Could a jury properly find that Gregory Middleton's commute ended once he was inside the Port of Savannah and, thus, he was within the scope of employment with Marine Terminals Corporation - East, d/b/a Ports America?

(2)    Even if Middleton's commute continued inside the Port, could a jury properly find that, because Middleton was driving to a dock house to get game plans, he was still within the scope of employment with Ports America?

(3)    Even if Middleton went to the wrong dock house, could a jury properly find that he was still within the scope of employment with Ports America?

The answer to each question is yes. And because a jury could properly find that Middleton was within the scope of employment with Ports America, the Court should reverse the district court's grant of summary judgment to Ports America.

## Statement Of The Case

This appeal arises from a civil tort action brought under Georgia law by Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks (the "Hickses") against Appellee-Defendant Marine Terminals Corporation - East, d/b/a Ports America ("Ports America") and Defendant Gregory Middleton ("Middleton"). On November 7, 2020, Middleton negligently drove his pickup truck, while inside the Port of Savannah, Garden City Terminal (the "Port"), and struck Mr. Hicks with

the pickup truck. Because of Mr. Hicks's nearly fatal injuries, the Hickses assert negligence claims against Middleton and vicarious liability claims against Ports America based on *respondeat superior*. The district court, however, granted summary judgment in Ports America's favor. The issues on appeal involve whether Middleton was acting within the scope of his employment with Ports America.

## 1.     Statement Of The District Court Proceedings

On December 7, 2020, the Hickses filed suit against Middleton and Ports America in the State Court of Chatham County, Georgia. *See* R-1-1 (State Ct. Documents) at 6-11. Against Middleton, Mr. Hicks asserts claims for negligence, punitive damages, and expenses of litigation under Georgia law, and Mrs. Hicks asserts claims for loss of consortium, punitive damages, and expenses of litigation under Georgia law. *See id.* at 8-10. Against Ports America, the Hickses assert vicarious liability claims based on *respondeat superior*. *See id.*

On January 6, 2021, Ports America with Middleton's consent removed this action to the U.S. District Court for the Southern District of Georgia. *See* R-1 (Removal Not.) at 1-5. This action was assigned to District Court Judge R. Stan Baker and Magistrate Judge Christopher L. Ray. *See id.* Over the next year, the parties conducted discovery and filed various motions not relevant to this appeal.

By December 31, 2021, discovery ended. *See* R-57 (3d Am. Scheduling Order) at 1. On January 31, 2022, Ports America moved for summary judgment in

its favor on the Hickses' vicarious liability claims. *See* R-60 (MSJ); R-60-1 (MSJ Br.); R-86 (MSJ Reply Br.). The Hickses opposed Ports America's motion for summary judgment. *See* R-82 (MSJ Opp'n); R-90 (MSJ Opp'n Surreply). The Hickses also requested an oral hearing on the motion. *See* R-93.

On September 26, 2022, the district court denied the Hickses' motion for oral hearing and granted summary judgment in Ports America's favor. *See* R-95. On October 26, 2022, Ports America moved for certification of the district court's summary judgment under Rule 54 (b) and for final judgment on that basis. *See* R-96. On November 23, 2022, the Hickses responded that, while maintaining that the district court's summary judgment is error, they did not oppose certification under Rule 54 (b) of the Federal Rules of Civil Procedure. *See* R-102 at 1. On November 28, 2022, the district court granted Ports America's motion and certified its summary judgment under Rule 54 (b). *See* R-104. On December 2, 2022, the district court entered final judgment in Ports America's favor. *See* R-105. And on December 28, 2022, the Hickses timely filed a notice of appeal from the district court's final judgment. *See* R-106. This appeal is now properly before this Court.

**2.      Statement Of The Facts**

**A.      Ports America hires dock workers out of ILA 1414's union hall, one hour before the start of on-ship duties.**

The Georgia Ports Authority ("GPA"), a governmental entity created by the State of Georgia, owns and controls the Port of Savannah, Garden City Terminal.

*See, e.g.*, O.C.G.A. § 52-2-1 *et seq.*; Georgia Ports Authority, Garden City Terminal, https://gaports.com/facilities/port-of-savannah/garden-city-terminal/.

While GPA owns and controls the Port—including providing police services for the Port—it does not run cargo operations (*i.e.*, unloading and loading ships). *Id.* Instead, private companies, together with labor unions, handle cargo operations. Specifically, Ports America is one of three private companies that, during the relevant time, provided cargo operations at the Port. *See* R-66 (Middleton Dep.) at 15-16. Under collective bargaining, International Longshoreman's Association Local 1414 ("ILA 1414") provides dock workers to Ports America and the other companies. *See* R-71 (Ports America 30 (b)(6)) at 68-178 (Pls.' Ex. 4, CBA).

Each working day, Ports America and the other companies hire dock workers out of ILA 1414's union hall. The hiring process is called a "shape up" or "check out" meeting, which takes place at the union hall exactly one hour before the start of on-ship duties. R-66 (Middleton Dep.) at 35; *see id.* at 36 ("Q. .... [L]et's say, the ship's ordered for a 1:00 p.m. start time .... so you show up at the Union Hall at noon or maybe a couple minutes before ... right? A. Exactly. They start checking out at noon."); *id.* at 23 (discussing other "check out" times for various shifts); R-65 (R. Hicks Dep.) at 28-29 (similar testimony).

At the shape up meeting, ILA 1414 will assign a "header" for each of the different jobs that a union member may perform. R-65 (R. Hicks Dep.) at 35-36;

R-66 (Middleton Dep.) at 37-38. Those jobs include "lasher,"[2] "water boy,"[3] "gang man,"[4] "jockey truck driver,"[5] *etc.*, and there will be a header for each of those types of jobs. *Id.* A header is a union member, typically with high seniority, who will select other union members, also based on seniority, who want the type of job to which the header has been assigned. *See* R-65 (R. Hicks Dep.) at 37; R-66 (Middleton Dep). at 36-39 ("The hiring officer sends the header down the line. .... When he get the amount of men he needs, then he don't need to hire no more.").

When a header selects a union member for a job, the dock worker gives their union card to the header, and "[t]he moment he takes your card," "[t]hat's when you know you have a job." R-66 (Middleton Dep.) at 43. The header then has the information from the union cards entered into a computer at the union hall, "so it can be pulled up," and they know "everybody who's working and where they're working." *Id.* at 44-45; *see* R-65 (R. Hicks Dep.) at 38. The union then generates a "gang card" or "dispatch sheet" that "shows the assignment of which ship [the

---

[2] A lasher is responsible for securing and releasing containers on the ships. *See, e.g.*, R-65 (R. Hicks Dep.) at 25.

[3] "When you fixing water for the ship, you put all the water containers, put all the coolers in your car and you wash 'em out, put the water in and bring 'em to the ship. .... So being water boy." R-65 (R. Hicks Dep.) at 53.

[4] "The gang man make sure ... the deck is set up, so when we get ready to load the deck ... all the boxes and the containers can go and be loaded on the deck, to make sure the deck be loaded." R-66 (Middleton Dep.) at 70. The "gang man" also has responsibilities involved in unloading containers. *Id.* at 71-76.

[5] A jockey truck "is a kind of semi-tractor intended to move semi-trailers within a cargo yard, warehouse facility, or intermodal facility." Wikipedia, https://en.wikipedia.org/wiki/Terminal_tractor.

union members] are going to." R-70 (Wills[6] Dep.) at 20-22; R-67 (Mosley[7] Dep.) at 41. And "[f]rom the time you check out, you're tied to the company you checked out to." R-66 (Middleton Dep.) at 35. "[Y]ou can't switch ships ...." *Id.*

### B. After being hired, dock workers must commute from the union hall to the Port and drive their personal vehicle through security.

The shape up meeting begins one hour before the start of on-ship duties, and after the meeting is done, dock workers must travel from the union hall to the Port. *See* R-66 (Middleton Dep.) at 45-46 ("[A]re you free to go wherever you want to and do whatever you want to do between 12:20 and 1:00 p.m., or are you supposed to go straight to the ship? A. No, you could eat your lunch, but you know that ship is starting at 1:00. You got to [go] to a job."). It takes about "[f]ifteen minutes" to drive "from the union hall to the gate" at the Port. R-67 (Mosley Dep.) at 111.

After a dock worker reaches the Port, "you're going through a gate that has either a police officer or a security guard," and "you have to have certain credentials to access [the] [P]ort." R-66 (Middleton Dep.) at 94; *see id.* at 95 ("Right, the TWIC [Transportation Worker Identification Credential] card and the Georgia Port card."). In other words, the Port is not open to the general public.

---

[6] Robert Wills was a Health, Safety, & Environmental Manager for Ports America, and he testified both in his individual capacity and as a Rule 30 (b)(6) designee. *See* R-70 (Wills Dep.); R-71 (Ports America 30 (b)(60 Dep.).

[7] Paul Mosley, Sr., is the "vice president of the ILA 1414" and has "worked for the ILA 1414" for at least "[s]eventeen years." R-67 at 12. Mosley was also on the scene when Middleton "was talking to the Georgia Ports Police Department and they had him detained" after the collision with Mr. Hicks. *Id.* at 70.

Moreover, pursuant to Letter of Understanding between ILA Local 1414 and the Georgia Stevedore Association (GSA), "[o]nly individuals who have been dispatched from the hiring hall ... by the headers should be on the port facilities." R-67 (Mosley Dep.) at 39. "Anyone on the port facilities who is not employed by a member of the Georgia Stevedore Association will be subject to suspension for a period of 15 days." *Id.* "Ports America is a member of the Georgia Stevedoring Association (GSA)." R-60-1 (MSJ Br.) at 2.

And while dock workers could theoretically choose any mode of transport to get from the union hall to the Port, the only way they can actually enter the Port is in their personal vehicle. A dock worker "would take [their] personal vehicle to go in ... because Georgia Ports Authority don't allow the individuals to walk on their port premises." R-67 (Mosley Dep.) at 60; *see id.* at 61 ("Well, [the dock worker] has to get to the ship somehow so ....").

### C.    Once inside the Port, Ports America requires dock workers to perform certain pre-ship duties to prepare for on-ship duties.

After a shape up meeting that can take about twenty minutes, and then another fifteen minutes to travel from the union hall to the Port, a dock worker has about twenty-five remaining minutes before the start of on-ship duties. During that time, and while the dock workers are inside the Port, Ports America *requires* dock workers to perform at least three pre-ship duties to prepare for on-ship duties.

*First*, a dock worker must obtain a "game plan" or "gang plan" issued by

Ports America. R-67 (Mosley Dep.) at 50-51, 71-72. "[P]icking up the gang plan is important to the cargo operation," *id.* at 72, because it lets the dock worker "know how the ship is being loaded, what's being unloaded and the plans for the ship," R-66 (Middleton Dep.) at 138. "Ports America has those planned in advance, so the work can be done more efficiently ...." *Id.* "[I]f you get to the ship, and no one's got plans about the cargo on that particular vessel," "it's going to be less efficient." *Id.* at 139. Indeed, a dock worker must "have a deck plan or a game plan." R-71 (Ports America 30 (b)(6) Dep.) at 15. "[T]hat's his whole job. He gets paperwork, and he knows the layout of the hatch, meaning the hatch covers." *Id.*

Normally, to obtain the game plan, a dock worker must go to the "dock house" closest to the "container berth" (CB) where their assigned ship is docked. *See* R-67 (Mosley Dep.) at 42-43. But that is "[n]ot necessarily" the case every time. *Id.* at 49. Sometimes, a Ports America superintendent "may take ... the gang plans to another dock house," and the dock worker must go to that dock house instead. *Id.* at 49-50. The Port has "nine container berths," "CB1, CB2, all the way up to CB9," and "four or five" dock houses. R-66 (Middleton Dep.) at 57-60.

*Second*, a dock worker must "put on personal protective equipment" as part of "their job duties for that particular job prior to the start time." R-67 (Mosley Dep.) at 80-81; *see also* R-69 (Tandy[8] Dep.) at 44 ("Q. They've got to go to the

---

[8]  James Tandy was "Chief Financial Officer" for Local 1414, and he also

dock house near the container b[e]rth and get the game plan? A. Correct. Q. And they need to put on their PPE, correct? A. Correct.").

*Third*, a dock worker must attend a ship-side "safety briefing" also as part of "their job duties for that particular job prior to the start time." R-67 (Mosley Dep.) at 80-81; *see also* R-69 (Tandy Dep.) at 85 (identifying "safety meeting" as an "example" one of the things that a dock worker "does for the stevedoring company prior to the whistle blowing" for on-ship duties).

### D. After completing their pre-ship duties, dock workers begin on-ship duties, one hour after being hired.

Unless their assigned ship is late, a dock worker starts on-ship duties one hour after the shape up meeting. At that point, the "walking boss," who is "the overall header or supervisor of the entire operation" for that ship, blows the whistle for the start of on-ship duties. R-69 (Tandy Dep.) at 45; *see* R-66 (Middleton Dep.) at 49. And once on-ship duties start, the dock worker's hourly wages start, despite the fact that they would have been under Ports America's control as soon as they entered the Port. *See* R-67 (Mosley Dep.) at 58 ("[A] longshore-person doesn't go on the clock until the start time, but that they are under the control of the stevedoring company when they enter the port.").

### E. On November 7, 2020, while driving his pickup truck inside the Port and performing one of his pre-ship duties, Middleton negligently struck Mr. Hicks with the truck.

personally "work[ed] as a longshoreman on the docks." R-69 (Tandy Dep.) at 19.

On November 7, 2020, Middleton was an ILA 1414 member, and he was at the union hall for a 12:00 p.m. shape up meeting. *See* R-66 (Middleton Dep.) at 64-65. During the shape up meeting, Middleton was selected to be part of a two-man gang for Ports America on the ship Hyundai Loyalty. *See id.* at 70.

Both then and now, Middleton believes that the Loyalty was docked at CB7, CB8, or CB9. *Id.* at 70 ("It was down by CB8 or CB9, somewhere down in there[.]"); *see also id.* at 79 ("And you believe that that vessel ... was going to be stevedored by Ports America and was going to be somewhere around CB7 or CB8? A. Yeah, somewhere between 7 and 9."). Middleton believes that was the correct container berth, despite documents "showing that [he was] assigned to CB4." *Id.* at 106; *see id.* at 69 ("So you disagree with the CB4 designation, right? A. Right.").

After the shape up meeting concluded, Middleton drove his silver Ford F150 pickup truck from the union hall straight to the Port. *Id.* at 88. Security video from GPA shows that Middleton entered the Port at around 12:37 p.m., when he was "approved to enter the port" and he was "driving past the security guard." *Id.* at 96.

Once inside the Port, Middleton's "plan was to go to the ship and [his] [game] plans." *Id.* at 86. "Going to the dock to get my plans, so I know what I have to do." *Id.* at 87; *see also id.* at 131-32 ("I was driving from off the dock to the dock house. .... Q. For the purpose of picking up your route papers? A. Right.").

And while Middleton has given conflicting testimony about whether he was

*also* going to heat up his lunch in the dock house, Middleton has repeatedly testified that getting the game plans was always at least one reason, if not the only reason, for going to the dock house. *Compare id.* at 86-87 ("[Y]our plan as you were driving to the port, was to go to the ship, and then figure out lunch after that? A. Lunch wasn't even in the scenario. .... Going to the dock to get my plans, so that I know what I have to do on the ship.") *with id.* at 166-67 ("I was going to drive around closer to the dock house to get the papers – to get the paperwork, and as I was rounding, I was going to go upstairs and warm up my food.").

And because Middleton believed that the Loyalty was docked at CB7, CB8, or CB9, that is the area where he drove inside the Port in order to obtain the game plans at the dock house nearest to where he believed the Loyalty was docked. The redline (with arrows) on the following map shows Middleton's path:



R-60-1 (MSJ Br.) at 6; *see also* R-66 (Middleton Dep.) at 185 (Def.'s Ex. 1); *id.* at 170-76 (testifying as to the security video). As Middleton's path shows, he drove to CB9 and then turned around heading back toward CB8.

However, at that same time, around 12:45 p.m., Mr. Hicks, another ILA 1414 member who had been selected to work for a different company at the Port, was "standing next to a jockey truck being driven by Annette Washington." R-65 (R. Hicks Dep.) at 73; *see also* R-64 (Edenfield Dep. at 43) at 11 ("Mr. Hicks was standing by the door of that vehicle; correct? A. Right ...."). And without warning or any fault by Mr. Hicks, Middleton drove his truck across the center line on First Street and collided with Mr. Hicks. *See* R1-1 (Compl.) at 8. "In the immediate wake of this wreck, Mr. Hicks was discovered face down with severe injuries, including a fractured skull with a brain bleed, broken neckbone and dislocated and separated shoulder." *Id.* Mr. Hicks has suffered from extensive hospitalizations and rehabilitations, and Mrs. Hicks "has been there every step of the way for Mr. Hicks." *Id.* at 9. Nonetheless, their marriage will never be the same.

Meanwhile, Middleton was found "slow and disoriented," and a responding officer observed signs of "impairment" and obtained a warrant to take Middleton's blood, given the severity of the crash. R-68 (Oglesby Dep.) at 8, 13. The GBI analysis shows "a positive for THC as well as fentanyl." *Id.* at 15; *see also* R-66 (Middleton Dep.) at 157 (pleading the Fifth Amendment on this subject).

3.    **Statement Of The Standard Of Review**

This Court reviews "the district court's grant of summary judgment *de novo*, viewing all evidence and drawing all reasonable factual inferences" in favor of the Hickses, as the non-movants, and against Ports America, as the movant. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [the judge] is ruling on a motion for summary judgment or for a directed verdict.'" *Id.*

## Summary Of The Argument

For three reasons, the district court erred when it granted summary judgment in Ports America's favor and held that Middleton was not acting within the scope of his employment with Ports America at the time of injury.

*First*, a jury could properly find that Middleton's commute ended once he was inside the Port and, thus, he was within the scope of employment. *Second*, even if Middleton's commute continued inside the Port, a jury could properly find that, because he was driving to a dock house to get game plans, he was within the scope of employment. *Third*, even if Middleton went to the wrong dock house, a jury could properly find that he was within the scope of employment.

## Argument And Citations Of Authority

"[T]he law of the state where the incident occurred" governs the question of

"whether an employee's conduct was within the scope of [their] employment." *Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir. 1996). Here, it is undisputed that the incident occurred in the State of Georgia, and the parties also agree that Georgia law governs. *See* R-95 (MSJ Order) at 8 n.4.

Under Georgia law, to hold an employer vicariously liable for a tort committed by their employee, "it must appear that *at the time of the injury* the [employee] was engaged in the [employer's] business and not upon some private matter of [their] own." *Clo White Co. v. Lattimore*, 590 S.E.2d 381, 382-83 (Ga. Ct. App. 2003). If an employee "'steps aside from [their] [employer's] business to do an act **entirely** disconnected from it' or commits a tortious act 'for **purely** personal reasons disconnected from the authorized business of the [employer],'" then "'the [employee] is not acting in the scope of [their] employment and in the furtherance of the [employer's] business.'" *Coe v. Carroll & Carroll, Inc.*, 709 S.E.2d 324, 331 (Ga. Ct. App. 2011) (emphasis added).

Importantly, "[t]he question [of] whether or not the [employee] at the time of an injury to another was acting in the prosecution of [the employer's] business and in the scope of [their] employment is for determination by the jury except in plain and indisputable cases." *Jump v. Anderson*, 197 S.E. 644, 646 (Ga. Ct. App. 1938); *see Remediation Res., Inc. v. Balding*, 635 S.E.2d 332, 334 (Ga. Ct. App. 2006).

Here, a jury could properly find that, at the time when Middleton drove a

pickup truck into Mr. Hicks, Middleton was engaged in Ports America's business, he was not doing an act *entirely* disconnected from Ports America's business, and he was not for *purely* personal reasons.

1.   **A jury could properly find that Middleton's commute ended once he was inside the Port and, thus, he was within the scope of employment.**

"'As a general rule, [an employee] in going to and from [their] work in an automobile acts only for [their] own purposes and not for those of [their] employer, and consequently the employer is not to be held liable for an injury occasioned while the servant is en route to or from [their] work.'" *Jones v. Aldrich Co.*, 373 S.E.2d 649, 650 (Ga. Ct. App. 1988).

There are two reasons for this rule. One is that, "[a]lthough [commuting] is work-motivated, the element of control is lacking." *Jones v. Blair*, 387 N.W.2d 349, 355 (Iowa 1986). The other is that "the employee is not ordinarily rendering services to the employer while traveling." *Jeewarat v. Warner Bros. Entm't Inc.*, 98 Cal.Rptr. 3d 837, 844 (Cal. Ct. App. 2009).

Here, the district court believed that "the undisputed evidence establishes that Defendant Middleton was commuting to work when the accident occurred." R-95 (MSJ Order) at 9. According to the district court, Middleton "was still driving when the accident occurred, he had not reported for duty, and he was under no orders to be at any certain place for approximately another fifteen minutes." *Id.* at 10. Thus, the district court held that Middleton "was not under Ports America's

control and was acting for his own purposes when the accident occurred." *Id.*

But each part of the district court's reasoning fails, and a jury could properly find that Middleton's commute ended once he was inside the Port.

*First*, while Middleton was obviously still driving at the time of injury, that does not mean he was still *commuting* at the time of injury. Those two things are not the same. Otherwise, if any time an employee drives, the drive counts as a continuation of their commute, *respondeat superior* as applied to anyone who drives as part of their job would cease to exist. The question is whether Middleton's driving at the time of injury was under Ports America's control or in service of its business—not simply whether Middleton was "still driving" as the district court seemingly asked. R-95 (MSJ Order) at 11.

A jury could properly find that Middleton's driving inside the Port was under Ports America's control. If Middleton were truly commuting while inside the Port, he could choose his mode of transportation. Middleton could walk, ride a bicycle, use ride share, or any other lawful modes of transit. But, as a dock worker, Middleton *must* "take his personal vehicle to go in ... because Georgia Ports Authority don't allow the individuals to walk on their port premises." R-67 (Mosley Dep.) at 60. And if Ports America truly had no control over Middleton's driving inside the Port, Middleton could be inside the Port even without Ports America's approval. But, as a dock worker, Middleton *must* be "dispatched from

the hiring hall" and "employed by a member of the Georgia Stevedore Association" in order to "be on the port facilities." R-67 (Mosley Dep.) at 39. If Ports America rescinded Middleton's employment, he would be required to leave the Port, further demonstrating Ports America's control over Middleton.

A jury could also properly find that Middleton's driving inside the Port was in service of Ports America's business. As Middleton has repeatedly testified, he was driving to "get my [game] plans." R-66 (Middleton Dep.) at 86; *see id.* at 87 ("Going to ... get my plans."); *id.* at 131-32 ("For the purpose of picking up your route papers? A. Right."); *id.* at 166-67 ("I was going to drive around closer to the dock house to get the papers ...."); R-79-1 (Middleton's Resp. to Pls.' 2d Interrogs.) at 4 ("Defendant was driving from the hiring house to the dock house to pick up his route papers for the day."); R-66 (Middleton Dep.) at 155 (verifying).

And as numerous witnesses have testified, picking up game plans plainly serves Ports America's business—above and beyond an ordinary commute to work. "[P]icking up the gang plan is important to the cargo operation," R-67 (Mosley Dep.) at 72, because it lets Middleton "know how the ship is being loaded, what's being unloaded and the plans for the ship," R-66 (Middleton Dep.) at 138. "Ports America has those planned in advance, so the work can be done more efficiently ...." *Id.* "[I]f you get to the ship, and no one's got plans about the cargo on that particular vessel," "it's going to be less efficient." *Id.* at 139. Indeed,

Middleton must "have a deck plan or a game plan." R-71 (Ports America 30 (b)(6) Dep.) at 15. "[T]hat's his whole job. He gets the paperwork, and he knows the layout of the hatch, meaning the hatch covers." *Id.*

*Second*, while Middleton "had not reported" for *on-ship* duties, R-95 (MSJ Order) at 10, he had reported for his pre-ship duties of obtaining the game plan, putting on personal protective equipment, and attending a ship-side safety meeting. Ports America requires performance of these pre-ship duties, and they are part of the job and in service of Ports America's business:

> Q. We've talked about some examples of where particular jobs **those persons have to start their job duties for that particular job prior to the start time** such as a jockey truck driver getting into the jockey truck.
> A. Yes, sir.
>
> Q. Such as the water boy cleaning out the water coolers and filling them.
> A. Yes, sir.
>
> Q. **Are there any duties like that that a member of a two-man gang would need to do before a start time?**
> A. So -- but we are clear that **the two-men gang member has to pick up their papers in the gang plan.**
>
> Q. Yes, right.
> A. Outside of that, no, sir.
>
> Q. Okay.
> A. **And the safety briefing**.
>
> Q. And so that we're clear, everyone has to get the gang plan, right?
> A. Yes.

Q. Everybody has to have the safety briefing?
A. Yes, sir.

Q. **Everybody has to put on personal protective equipment?**
A. **Yes, sir**.

R-67 (Mosley Dep.) at 80-81 (emphasis added).

Moreover, it does not matter that Middleton "was not 'on the clock' and being paid for his time." *Clo White*, 590 S.E.2d at 382. "Activities within the scope of employment include those that are necessarily incidental to the employment, **even if the employee is off duty** ...." *Smith v. CSX Transp., Inc.*, 751 S.E.2d 604, 606 (Ga. Ct. App. 2013) (emphasis added). And Ports America "gained an incidental benefit" from requiring Middleton and other dock workers to perform various pre-ship duties. *Patterson v. Se. Newspapers, Inc.*, 533 S.E.2d 119, 121 (Ga. Ct. App. 2000). By requiring these pre-ship duties, Ports America avoided having its dock workers "learn[] all of that stuff on the fly while [they're] on the deck of the ship." R-71 (Ports America 30 (b)(6) Dep.) at 15. "This benefit would not result from ordinary commuters ...." *Patterson*, 533 S.E.2d at 121.

*Third*, it is both incorrect and irrelevant for the district court to have found that Middleton "was free to turn his vehicle around and leave the Port premises if he desired, so long as he returned and reported to the Vessel ready to work by 1:00 p.m." R-95 (MSJ Order) at 10. It is incorrect because Middleton could *not* simply leave and report back at 1:00 p.m. Again, Ports America required Middleton to

complete certain pre-ship duties and that meant performing work *before* 1:00 p.m.:

> Q. Okay. So that's the reason for getting there. You talked about getting there early. <u>**You can't just get there at 1:00 --**</u>
> <u>**A. No.**</u>
>
> <u>**Q. -- and have no plans?**</u>
> <u>**A. No.**</u> Because you got to get dressed, got to get ready. Put on safety equipment. <u>**Got to do all of that before it's time**</u> to go up the ladder.
> ....
> A. All companies.
>
> Q. All right. All companies. And on this particular day, <u>**you don't have any reason to believe that Ports America disposed of those requirements, right?**</u>
> A. <u>**No**</u>.
>
> Q. Same thing on this particular day, you don't have any reason to believe that Ports America disposed of their need for the sort of plans we talked about earlier, to make sure their cargo's discharged or loaded efficiently and effectively, right?
> A. Right.
>
> Q. <u>**That helps make sure Ports America gets their work done on time?**</u>
> A. <u>**Yes**</u>.

R-66 (Middleton Dep.) at 139-40 (emphasis added).

It would also be irrelevant even if Middleton could leave the Port. Perhaps, if Middleton had decided to leave the Port and while trying to leave the Port he injured Mr. Hicks, this finding could make some sense. Yet, that is not what happened here. Middleton was not in the process of leaving the Port. He was going to get game plans from Ports America, an act it required him to do as part of the

job and in service of its business—not purely Middleton's interests.

In sum, a jury could properly find that Middleton's commute ended once he was inside the Port and, thus, he was within the scope of employment. At that point, Middleton was no longer an ordinary member of the public engaged in a regular commute to work. Once inside the Port, Middleton did not control how he could travel within the Port, and he was not free to do whatever he wanted until 1:00 p.m. Rather, Ports America required Middleton to complete certain pre-ship duties inside the Port, and while engaged in one of those duties for Ports America's business—obtaining the game plans—Middleton injured Mr. Hicks.

## 2. Even if Middleton's commute continued inside the Port, a jury could properly find that, because he was driving to a dock house to get game plans, he was within the scope of employment.

Like any other general rule, the rule that an employee's commute is not within the scope of employment has exceptions.[9] One such exception is where the employee is on their way to work and performs "'the discharge of some duty incidental to the nature of [their] employment in the interest of, or under direction of, [their] employer, and an injury arises en route.'" *Jones*, 373 S.E.2d at 651. "'[S]uch injury is considered ... in the course of the employment.'" *Id.*

---

[9] To be clear, as set forth in the preceding section, the general going-and-coming rule does not apply here, and there is no need for an exception. The Court need only reach this exception if it concludes that Middleton's commute did not end once he was inside the Port. Of course, alternatively, if the Court concludes that this exception applies, then the Court need not reach the question of whether the general rule applies in the first place.

In Georgia, this exception is called the "special circumstances" exception. *Clo White*, 590 S.E.2d at 383. In other jurisdictions, it is called the "incidental benefit" exception. *Huntsinger v. Glass Containers Corp.*, 99 Cal. Rptr. 666, 670-71 (Cal. Ct. App. 1972). Regardless of the label, the exception means the same thing. Where an employer receives a special or incidental benefit "not common to commute trips by ordinary members of the work force," an injury that arises even during a commute is within the course of employment. *Id.*; *see also Patterson*, 533 S.E.2d at 121 ("This benefit would not result from ordinary commuters ....").[10]

Here, the district court held that, to determine whether this exception applies, "Georgia courts examine factors such as whether the employee was carrying work materials or using a cell phone or pager for work-related calls; whether the employee received a stipend for the use of his vehicle; or whether the employee was 'on call.'" R-95 (MSJ Order) at 9. Having found none of those facts here and providing *no other analysis*, the district court believed that there is no basis for a jury to find special circumstances or an incidental benefit. *Id.* at 12.

But the district court incorrectly treated those factors as *requirements*. There is no Georgia precedent that says special circumstances can be found *only* in cases involving transport of work materials, use of a cell phone, a stipend for vehicle use,

---

[10] The Hickses are not appealing the district court's holding that there is no basis for a jury to find that the special *mission* exception applies. *See* R-95 (MSJ Order) at 12. The special mission exception is separate and distinct from the special circumstances or incidental benefit exception.

or an on-call employee—and nothing else. Nor would that make any sense, given that, for example, this exception predates the use of cell phones.

Rather, this exception asks only whether there is "a special circumstance whereby the employee may have actually been conducting some manner of company business at the same time that [they were] on the way to work when the accident occurred." *Clo White*, 590 S.E.2d at 383. In other words, the question is not whether the employee was using a cell phone or some other tool while commuting; the question is whether the employee was doing *any* company business above and beyond an ordinary commute to work.

Consider the facts and reasoning of *Clo White*. There, "Pilgrim, a shift supervisor at Clo White, was on his way to work one morning when he lost control of his car and collided with a car driven by Lattimore." *Id.* at 382. Pilgrim "admitted that he made at least one call to the office before the accident," and "[t]he purpose ... was to ... obtain information that would assist Pilgrim **in fulfilling his duties at the office**." *Id.* (emphasis added). "[E]ven though he was not 'on the clock' and being paid for his time," the Georgia Court of Appeals held that this evidence "supports the conclusion that Pilgrim may have actually been on the phone regarding matters of company business *at the time of the accident*." *Id.* at 382-83. "Therefore, a jury issue exists as to whether Pilgrim was acting with the scope of his employment and conducting the [employer's] business at the time of

the accident such that Clo White could be liable." *Id.*; *see also Hunter v. Modern Con'l Constr. Co.*, 652 S.E.2d 583, 584 (Ga. Ct. App. 2007) (similar).

*Clo White's* reasoning applies here. "[E]ven though he was not 'on the clock' and being paid for his time," Middleton was driving to a dock house to get game plans "that would assist [him] in fulfilling his duties [on the ship]." *Clo White*, 590 S.E.2d at 382-83. Thus, a jury issue exists as to whether, even while commuting, Middleton was engaged in Ports America's business—getting the game plans—when he negligently drove his pickup truck into Mr. Hicks.

Case law from other jurisdictions outside of Georgia also confirms that the special circumstances exception does not have the narrow application the district court gave it here. *See, e.g.*, *Patterson*, 533 S.E.2d at 122 ("We find support for this result in two cases from other jurisdictions facing similar facts.").

Consider *Haco Drilling Co. v. Burchette*, 364 P.2d 674 (Okla. 1961). There, Hughes was part of a drilling crew for Haco Drilling, and every morning, the crew was required to "bring [a] can with ice and water to the drill site every morning." *Id.* at 676. After picking up ice and water from an icehouse on the way to the drill site, the crew were involved in a motor vehicle collision, and Hughes died. *Id.* Even though "Haco did not furnish the car and had no interest in it and paid no mileage or expense of its operation," and "[t]he wages of the crew began at 7 a.m. when they went on the rig," the Oklahoma Supreme Court held that this evidence

"presents an exception to the general rule." *Id.* at 676-77. "Hughes was going to work but this does not vary the fact that he was engaged in carrying out instructions given relative to performance of acts in his employment." *Id.* at 677. "'It is not essential to liability by the [employer] that the [employee] be entitled to compensation for the work at the time of the action causing the damage; it is enough to render the [employer] liable if the person causing the injury was in fact rendering service for [the employer] by [their] consent, express or implied.'" *Id.*

*Haco Drilling's* reasoning applies here. Even though Ports America did not furnish Middleton's pickup truck, had no interest in it, and paid no mileage or expense, and even though Middleton's wages did not begin until he was on the ship at 1:00 p.m., this does not change the fact that he was carrying out one of Ports America's job requirements—obtaining the game plans.

In sum, even if Middleton's commute continued inside the Port, a jury could properly find that, because he was driving to a dock house to get game plans, Middleton was still within the scope of employment. At the same time he may have been commuting, Middleton was also obtaining information and discharging a required pre-ship duty that would assist Ports America's business.

### 3.    Even if Middleton went to the wrong dock house, a jury could properly find that he was within the scope of employment.

Independent of the rules and exceptions regarding whether an employee's commute is within the scope of employment, there are also rules governing when a

deviation from a usual route to perform a service for the employer constitutes an abandonment of an employer's business. In other words, assuming the employee's driving is not subject to the going-and-coming rule, these rules ask whether the employee's route was so extreme to take it outside the scope of employment.

As the Georgia Court of Appeals explains, "in most cases," "the liability of the [employer] for the negligence of the employee in the course of some deviation is a question of fact for the jury to decide." *Davis Gas Co. v. Powell*, 232 S.E.2d 258, 259-60 (Ga. Ct. App. 1976). "The deviation may be so uncertain in extent or degree that the inference must be drawn by the trial jury as to whether or not it has been such an abandonment to relieve the [employer] from responsibility for the [employee's] action." *Id.* at 260. "Where the evidence shows that the employee was not taking the shortest or most direct route for the performance of the duties of [their] employment, or had stopped en route, whether the deviation was so substantial as to constitute a departure from the employment, or whether [the employee] was nevertheless acting within the scope of [their] employment, is generally a question of fact for the jury." *Id.*

Here, the district court found that "there is no evidence that Defendant Middleton knew, was told, or otherwise had reason to believe that the game plans were not at or around the Vessel (at CB4 or its adjacent dock house)," and, thus, "there is no evidence that he needed to travel to CB8's adjacent dock house to

obtain the plans.'" R-95 (MSJ Order) at 10.

But there are several problems with the district court's findings. As an initial matter, the district court simply misunderstood Middleton's testimony. The district court *assumed* that Middleton knew the correct location of the Loyalty to be CB4, and from this assumption, the district court then found that Middleton had no reason to believe that the game plans would be at the dock house next to CB8.

Yet, a jury could properly find that Middleton actually believed that the Loyalty was docked at CB7, CB8, or CB9. *See* R-66 (Middleton Dep.) at 70 ("It was down by CB8 or CB9, somewhere down in there[.]"); *id.* at 79 ("Q. .... And you believe that vessel ... was going to be stevedored by Ports America and was going to be somewhere around CB7 or CB8? A. Yeah, somewhere between 7 and 9."). Indeed, Middleton still believes that was the correct container berth, despite documents "showing that [he was] assigned to CB4." *Id.* at 106; *see id.* at 69 ("So you disagree with the CB4 designation, right? A. Right."). And because Middleton believed that the Loyalty was docked at CB7, CB8, or CB9, he had good reason to think that the game plans would be near CB8. In Middleton's mind, he *was* going to the "dock house nearest to the Vessel." R-95 (MSJ Order) at 11.

The fact that Middleton may have been mistaken about the Loyalty's actual docking location does not even remotely change the analysis. The question is not whether Middleton was a good or bad employee, or even if Middleton willfully

committed a tort; it is simply whether he was engaged in Ports America's business. After all, an employer "rarely commands [an employee] to be negligent, or employs [them] with the expectation that [they] will commit a negligent or willful tort; but if the act is done in the prosecution of the [employer's] business—that is, if the [employee] is at the time engaged in serving [the employer]—the latter will be liable." *S. Grocery Stores v. Herring*, 11 S.E.2d 57, 59 (Ga. Ct. App. 1940).

Moreover, even if Middleton did know that he was driving "nearly a mile past his assigned ship," Doc. 60-1 (MSJ Br.) at 2, that still would not be enough to justify summary judgment. For example, in *Coe*, even though the employee was "detouring **2.5 miles away** from his route in order to pick up lunch," the Georgia Court of Appeals held that "a jury issue exists regarding whether the employee is acting within the scope of his employment during the brief detour." 709 S.E.2d at 327, 332 (emphasis added). Similarly, in *Davis Gas*, the Georgia Court of Appeals noted that "[t]he mere fact that, at the time of an accident, the driver of an automobile intended to deviate from his regular route the distance of about **thirteen blocks** to take a woman to her home is not such evidence of a marked and unusual deviation as requires the court to hold as a matter of law that the driver was not on his [employer's] business." 232 S.E.2d at 260 (emphasis added).

In other words, a jury could properly find that, even going in the wrong direction for a mile, Middleton was still in service of Ports America's business and

at least one reason for his route was to get the game plans. That is especially true given that the district court did not and cannot identify any evidence of a *purely* personal reason for why Middleton went to get the game plans from the dock house near CB8. The district court *inferred* that Middleton must have had a purely personal reason based on what it believed to be an absence of any explanation for why he went to the dock house near CB8 instead of the dock house near CB4. Yet, selecting which inferences to draw is something only a jury can do, particularly when Middleton has directly testified that he believed the Loyalty to be docked near CB8.[11] His mistake does not present a purely personal reason; it simply means Middleton was a bad employee, which is not an exception to *respondeat superior*.

### Conclusion

For those reasons, this Court should reverse the district court's summary judgment in favor of Ports America. Signature and certificate pages follow.

---

[11] There is also evidence that game plans are "[n]ot necessarily" at the dock house closest to the ship, and Middleton—even if mistaken—could have believed that the superintendent had moved them. R-67 (Mosley Dep.) at 42-43, 49.

The Hickses submit this brief on March 8, 2023.

**/s/ Naveen Ramachandrappa**

Naveen Ramachandrappa
Ga. Bar No. 422036
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100
*ramachandrappa@bmelaw.com*

Brent J. Savage, Sr.
Ga. Bar No. 627450
Zachary R. Sprouse
Ga. Bar No. 276708
James H. Wilson, III
Ga. Bar No. 768450
SAVAGE TURNER PINCKNEY
SAVAGE & SPROUSE
Post Office Box 10600
Savannah, GA 31412
912-231-1140
*bsavage@savagelawfirm.net*
*zsprouse@savagelawfirm.net*
*jwilson@savagelawfirm.net*

*Attorneys for Appellants-Plaintiffs*
*Richard Hicks and Jocelyn Hicks*

## <u>Certificate Of Compliance</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains a total of 7,673/13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on March 8, 2023.

**<u>/s/ Naveen Ramachandrappa</u>**

## Certificate Of Service

I certify that, on March 8, 2023, I filed **Appellants-Plaintiffs Richard Hicks And Jocelyn Hicks' Principal Brief** with the Clerk of Court using the CM/ECF system, which will serve this document on the following counsel:

*Attorneys for Appellee-Defendant Marine Terminals Corporation - East*

Marc H. Bardack
Michael P. Freed
Elissa Haynes
FREEMAN MATHIS & GARY, LLP
100 Galleria Pkwy, Ste 1600
Atlanta, GA 30339-5948
*mbardack@fmglaw.com*
*mfreed@fmglaw.com*
*ehaynes@fmglaw.com*

Jason Pedigo
Phillip Thompson
ELLIS, PAINTER, RATTERREE & ADAMS, LLP
PO Box 9946
Savannah, GA 31412
*pedigo@epra-law.com*
*pthompson@epra-law.com*

*Attorneys for Defendant Gregory Middleton*

Craig Terrett
Joy Lee
CRUSER, MITCHELL, NOVITZ, SANCHEZ,
GASTON & ZIMET, LLP
275 Scientific Dr, Meridian II, Ste 2000
Peachtree Corners, GA 30092
*cterret@cmlawfirm.com*
*jlee@cmlawfirm.com*

**/s/ Naveen Ramachandrappa**

Certificate of Service Page