Case No. 22-14324

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

RICHARD HICKS and JOCELYN HICKS,
Appellants-Plaintiffs,

v.

GREGORY MIDDLETON, JOHN DOE 1, and MARINE TERMINALS
CORPORATION – EAST, d/b/a PORTS AMERICA,
Appellees-Defendants.

---

Appeal from the United States District Court
for the Southern District of Georgia

**<u>Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks' Reply Brief</u>**

Naveen Ramachandrappa
BONDURANT, MIXSON & ELMORE, LLP
1201 W Peachtree St NW, Ste 3900
Atlanta, GA 30309
404-881-4100

Brent J. Savage
Zachary R. Sprouse
James H. Wilson, III
SAVAGE, TURNER, PINCKNEY, SAVAGE & SPROUSE
102 E. Liberty Street, 8th Floor
P.O. Box 10600
Savannah, GA 31412
(912) 231-1140

*Attorneys for Appellants-Plaintiffs*
*Richard Hicks and Jocelyn Hicks*

Case No. 22-14324
Richard Hicks v. Gregory Middleton

**<u>Certificate Of Interested Persons</u>**
**<u>And Corporate Disclosure Statement</u>**

The Hickses' counsel certify that the following is a complete list[1] of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations (including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party) that have an interest in the outcome of this particular case or appeal:

- Baker, Hon. R. Stan (District Court Judge, S.D. Ga.)

- Bardack, Marc H. (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Bondurant, Mixson & Elmore LLP (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP (Counsel for Defendant Gregory Middleton)

- Ellis, Painter, Rattertree, & Adams LLP (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

---

[1] This list is the same list that the Hickses provided in their Principal Brief filed on March 8, 2023.

Case No. 22-14324
Richard Hicks et al. v. Gregory Middleton et al.

- Freed, Michael P. (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Freeman, Mathis & Gary, LLP (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Grant, R. Russell II (Counsel for Defendant Gregory Middleton)

- Haynes, Elissa (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Hicks, Jocelyn (Appellant-Plaintiff)

- Hicks, Richard (Appellant-Plaintiff)

- Lee, Joy (Counsel for Defendant Gregory Middleton)

- Marine Terminals Corporation – East, d/b/a Ports America (Appellee-Defendant)

- Middleton, Gregory (Defendant)

- Pedigo, Jason Carl (Counsel for Appellee-Defendant Marine Terminals Corporation – East)

- Ports America Terminals, Inc. (100% owner and parent corporation of Appellee-Defendant Marine Terminals – East)

Case No. 22-14324
Richard Hicks et al. v. Gregory Middleton et al.

- Ramachandrappa, Naveen (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Ray, Hon. Christopher L. (Magistrate Judge, S.D. Ga.)

- Savage, Brent J., Sr. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Savage, Turner, Pinckney, Savage & Sprouse (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Sprouse, Zachary R. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

- Terrett, Craig P. (Counsel for Defendant Gregory Middleton)

- Thompson, Philip M. (Counsel for Appellee-Defendant Marine Terminals Corporation - East)

- Wilson, James H. (Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks)

Counsel for Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks further certify that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## <u>Table Of Contents</u>

Certificate Of Interested Persons ............................................................C-1

Table of Citations............................................................................... ii

Argument.............................................................................................1

      1.      A jury could find that Middleton was Ports America's
            employee at the time of the collision. ....................................1

            A.     The Hickses did not abandon this issue in the district
                 court.............................................................................1

            B.     The Hickses have not abandoned this issue in this Court..........3

            C.     Middleton was Ports America's employee at the time of
                 the collision. ................................................................5

      2.      A jury could find that Middleton's commute ended once he was
            inside the Port and, thus, he was within the scope of
            employment. .........................................................................11

      3.      Even if Middleton's commute continued inside the Port, a jury
            could find that, because he was getting his game plans, he was
            within the scope of employment. .......................................17

      4.      Even if Middleton was going to the wrong dock house, a jury
            could find that he was within the scope of employment....................21

Conclusion ......................................................................................22

## <u>Table of Citations</u>

**Federal Cases**

*Hamilton v. Southland Christian Sch., Inc.*,

    680 F.3d 1316 (11th Cir. 2012) ..................................................................4, 5

*Hussein v. Oshkosh Motor Truck Co.*,

    816 F.2d 348 (7th Cir. 1987) ..........................................................................4

*Innovation Ventures, LLC v. N.V.E., Inc.*,

    694 F.3d 723 (6th Cir. 2012) ..........................................................................4

*Macias v. Sw. Cheese Co., LLC*,

    624 F. App'x 628 (10th Cir. 2015) .................................................................4

*Prescott v. Cracker Barrel Old Country Store, Inc.*,

    805 F. App'x 612 (10th Cir. 2020)..................................................................4

*Smith as next friend of MS v. Crisp Reg'l Hosp., Inc.*,

    985 F.3d 1306 (11th Cir. 2021) ......................................................................3

*United States v. Brown*,

    348 F.3d 1200 (10th Cir. 2003) ......................................................................4

**Georgia Cases**

*Clo White Co. v. Lattimore*,

    590 S.E.2d 381 (Ga. Ct. App. 2003) ........................................................6, 18

*Coe v. Carroll & Carroll, Inc.*,

709 S.E.2d 324 (Ga. Ct. App. 2011) .........................................................15

*Davis Gas Co. v. Powell*,

232 S.E.2d 258 (Ga. Ct. App. 1976) ...................................................19, 20

*Gateway Atlanta Apartments, Inc. v. Harris*,

660 S.E.2d 750 (Ga. Ct. App. 2008) .........................................................6, 7

*Hous. Auth., City of Cartersville v. Jackson*,

486 S.E.2d 54 (Ga. Ct. App. 1997)..............................................................6

*Jones v. Aldrich Co., Inc.*,

373 S.E.2d 649 (Ga. Ct. App. 1998) ...................................................17, 18

*Patterson v. Se. Newspapers, Inc.*,

533 S.E.2d 119, 121 (Ga. Ct. App. 2000) ...........................................17, 20

*S. Grocery Stores v. Herring*,

11 S.E.2d 57 (Ga. Ct. App. 1940) .............................................................16

**Other State Cases**

*Carter v. Reynolds*,

815 A.2d 460 (N.J. 2003) ...............................................................11, 12, 13

*Huntsinger v. Glass Containers Corp.*,

99 Cal. Rptr. 666 (Cal. Ct. App. 1972).......................................................17

**Georgia Statutes**

O.C.G.A. § 10-6-58...................................................................................10

## <u>Argument</u>

**1.    A jury could find that Middleton was Ports America's employee at the time of the collision.**

Ports America[2] begins its argument to this Court *not* by defending the district court's order. Instead, Ports America opens by pressing an alternative argument that the district court did not decide. It argues that "Middleton's 'employment' ... on the day of the incident did not begin until the 1:00 p.m. start time," "[s]o Ports America did not employ him went [*sic*] the incident occurred"; that the Hickses "failed to address the issue" in the district court and in their Principal Brief; and "[c]onsequently, [they have] abandoned the issue." Ports America's Br. at 11. But even a quick review of the record and appellate procedure shows that Ports America's arguments on this issue lack merit.

### A.    The Hickses did not abandon this issue in the district court.

In opposing Ports America's motion for summary judgment, the Hickses repeatedly argued that Middleton's employment with Ports America began *before* the start of on-ship duties at 1:00 p.m. and that Middleton was Ports America's employee at the time he negligently drove his pickup truck into Mr. Hicks.

Beginning with the Factual Background in their response brief, the Hickses

---

[2] Like in the Principal Brief, this Reply Brief will refer to Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks as the "Hickses"; Appellee-Defendant Marine Terminals Corporation – East as "Ports America"; Defendant Gregory Middleton as "Middleton"; and the labor union as "ILA 1414."

said that, "**[p]rior to the wreck, Middleton had been hired** to work for Ports America." R-82 (MSJ Opp'n) at 2 (emphasis added). "As Ports America is aware, Middleton testified[3] that he was working for Ports America at the time of this wreck." *Id.* "Although a longshoreman ... typically begins getting paid starting at the time when onboard cargo operations are set to begin, Ports America expects these workers to have already participated in a variety of [pre-ship] duties in advance so that the operation can run more efficiently." *Id.* at 3.

Next, in the Argument and Citation of Authority in their response brief, the Hickses again said that, "[o]n November 7th, 2020, prior to the wreck, Defendant Middleton was hired to serve Ports America." *Id.* at 9. "**Having already been hired** for the job and inside the GPA gates at the time of the wreck, Middleton was driving to the dock house to pick up his game plans." *Id.* (emphasis added).

And if the Hickses' position on this issue were still somehow in question, their response to Ports America's statement of material facts would resolve it:

> Because Middleton never arrived at CB4 to work the HYUNDAI LOYALTY, Ports America never employed him. (Wills depo., p. 16).
>
> **Response: Denied. Ports America hired Middleton when its header selected and hired him at the hiring house. (See Mosley Depo., p. 17:4-6; Tandy Depo., p. 25:18-20, 25:16-18).**

R-82-1 (SUMF Resp.) ¶ 47 (emphasis in original).

---

[3] *See* R-79-1 (Middleton Interrog. Resps.) at 4 ("Defendant [Middleton] was working for Marine Terminals Corporation, East d/b/a 'Ports America' at the time of the subject wreck.") (emphasis omitted).

In sum, the record shows that, in the district court, the Hickses consistently denied Ports America's position that Middleton was not Ports America's employee at the time he negligently drove his pickup truck into Mr. Hicks.

**B.    The Hickses have not abandoned this issue in this Court.**

In their Principal Brief to this Court, the Hickses said that "[t]he issues on appeal involve whether Middleton was acting within the scope of his employment with Ports America." Hickses' Principal Br. at 2. The Hickses did not identify as one of the issues on appeal Ports America's alternative argument that Middleton never became its employee. That is because the district court did not reach that issue. *See* R-95 (MSJ Order) at 7-8 ("[T]he Court need not decide that issue ....").

Even though the district court did not reach its alternative argument, Ports America nonetheless asserts that the Hickses had a duty to address this undecided issue in their Principal Brief and, by failing to do so, the Hickses "abandoned the issue." Ports America's Br. at 16 (citing *Smith as next friend of MS v. Crisp Reg'l Hosp., Inc.*, 985 F.3d 1306, 1309 (11th Cir. 2021)).

But nothing in *Smith*, nor any other authority known to the Hickses, supports Ports America's assertion that, in the *principal* brief, an appellant must address undecided, alternative grounds to affirm a district court's ruling.

Instead, courts consistently hold that "[a]n appellant is not required to anticipate and rebut in [their] opening brief every possible ground for affirmance

that the defendant might (or might not) raise." *Hussein v. Oshkosh Motor Truck Co.*, 816 F.2d 348, 359 (7th Cir. 1987) (Posner, J., concurring). "It is enough if the appellant contests the grounds on which the district court actually decided the case against [them]." *Id.*; *see Prescott v. Cracker Barrel Old Country Store, Inc.*, 805 F. App'x 612, 616 (10th Cir. 2020) ("Her opening brief quite properly focuses on the ground that the district court relied on for granting summary judgment.").

Thus, when "arguments do not relate to the basis of the district court's ruling" and only "raise potential alternative grounds for affirming that ruling," "the appellant is entitled to respond in its reply brief." *United States v. Brown*, 348 F.3d 1200, 1212-13 (10th Cir. 2003); *see Hussein*, 816 F.2d at 359 ("So it wasn't too late for the plaintiff, in his reply brief, to point out the fallacy of the defendant's argument for collateral estoppel."); *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 729 (6th Cir. 2012) ("Consequently, there is no waiver, and we find that LE properly responded [in its reply] to the alternative basis for affirmance raised on appeal by NVE."); *Macias v. Sw. Cheese Co., LLC*, 624 F. App'x 628, 637 fn.10 (10th Cir. 2015) ("explaining that an appellant must explain in the opening brief why the district court was wrong and may respond in a reply brief to potential alternative grounds for affirming").

Indeed, under this Court's precedent, an appellee forfeits alternative grounds if the appellee fails to raise them in their brief. *See, e.g., Hamilton v. Southland*

*Christian Sch., Inc.*, 680 F.3d 1316, 1318-19 (11th Cir. 2012) (finding forfeiture of "an alternative basis for affirming" by not "including that argument in its brief as appellee"). An appellee-forfeiture rule can exist only if it is the appellee's—not the appellant's—duty to raise undecided, alternative grounds.

### C.  Middleton was Ports America's employee at the time of the collision.

Of course, now that Ports America has raised its argument that Middleton never became its employee as an alternative (and apparently its number one) basis for affirming the district court, the Hickses must and will expressly[4] address it.

To be clear, Ports America does *not* argue that Middleton or other dock workers it hires from ILA 1414 are independent contractors. It would have been difficult for Ports America to make that argument for many reasons, including because the collective bargaining agreement consistently refers to the stevedoring companies as "the Employers" and the workers as "employees," and the agreement otherwise contains all the hallmarks of an employment relationship. R-71 at 72.

Rather, Ports America argues that Middleton and other dock workers do not

---

[4] Although the Hickses did not, in their Principal Brief, expressly address Ports America's alternative argument that Middleton never became its employee, the arguments they did make regarding scope of employment necessarily and implicitly addressed this issue. After all, and as the Court will see from the Hickses' arguments, the same evidence that Middleton was within the scope of his *employment* at the time of the collision is also evidence that Middleton was *employed* by Ports America at the time of the collision. To claim that these two issues—the scope of employment and when the employment relationship started— are somehow separate in this case is the epitome of elevating form over substance.

become its employees until on-ship duties start. But that is essentially the same argument that Ports America makes for why Middleton was not within the scope of his employment, and so the argument fails for all the same reasons.

For example, Ports America argues that, "because Middleton never reported to the ship, Ports America never placed him on its payroll for that day." Ports America's Br. at 17; *see id.* (arguing that it did not "pay him for his time between the shape-up meeting and the 1:00 p.m. start time for [on-ship duties]").

But how and when Ports America begins to *pay* its employees is not dispositive in determining when an employment relationship begins. As Georgia law makes clear, "'[p]ayment of money may be corroborative of other facts indicating employment at a given time, but is not of itself conclusive.'" *Hous. Auth., City of Cartersville v. Jackson*, 486 S.E.2d 54, 56-57 (Ga. Ct. App. 1997); *cf. Clo White Co. v. Lattimore*, 590 S.E.2d 381, 382 (Ga. Ct. App. 2003) (finding the employee was within the scope of employment "even though he was not 'on the clock' and being paid for his time").

Ports America's own cited authority also makes clear that an employer's *control* is the main test, not payment. "To determine whether [an employment] relationship exists, we consider the right of the employer to **control** the activities of the employee in the employment duties." *Gateway Atlanta Apartments, Inc. v. Harris*, 660 S.E.2d 750, 755 (Ga. Ct. App. 2008) (emphasis added). "The main

tests are whether the [employer] is granted or assumes the right to control the time, manner, means, and method of executing the work, and whether the [employer] has the right to discharge the [employee]." *Id.* "Another issue to be considered is whether the [employer] receives a benefit from the [employee's] actions." *Id.*

And though Ports America asserts that it "did not control Middleton between when the union assigned him to the two-man gang and the start time [for on-ship duties]," Ports America's Br. at 17, a jury could properly reject that assertion.

While *on-ship* duties may not begin until 1:00 p.m., Ports America requires dock workers on the two-person gang to complete *pre-ship* duties of obtaining the game plan, putting on personal protective equipment, and attending a ship-side safety meeting well *before* 1:00 p.m.:

> Q. We've talked about some examples of where particular jobs **those persons have to start their job duties for that particular job prior to the start time** such as a jockey truck driver getting into the jockey truck.
> A. **Yes, sir**.
>
> ....
>
> Q. **Are there any duties like that that a member of a two-man gang would need to do before a start time?**
> A. So -- but we are clear that **the two-men gang member has to pick up their papers in the gang plan.**
>
> ....
>
> Q. Okay.
> A. **And the safety briefing**.

....

Q. **Everybody has to put on personal protective equipment?**
A. **Yes, sir**.

R-67 (Mosley Dep.)[5] at 80-81 (emphasis added).

As Middleton himself testified, those pre-ship duties were the reason he was at the Port before 1:00 p.m., Ports America required him to complete those pre-ship duties, and those pre-ship duties serve Ports America's business:

Q. Okay. **So that's the reason for getting there**. You talked about getting there early.
**You can't just get there at 1:00 --**
**A. No.**

**Q. -- and have no plans?**
**A. No.** Because you got to get dressed, got to get ready. Put on safety equipment. **Got to do all of that before it's time** to go up the ladder.
....
A. All companies.

Q. All right. All companies. And on this particular day, **you don't have any reason to believe that Ports America disposed of those requirements, right?**
A. **No**.

---

[5] As Ports America correctly notes, the Hickses have chosen not to appeal the district court's order granting, in part, a motion to exclude certain expert testimony from Paul Mosley and James Tandy. *See* R-92. Notably, though, the district court did not exclude either witness from testifying as a *lay* witness (both witnesses personally worked at the hiring hall and at the Port). And the district court only excluded Tandy from offering one of his opinions. *See id.* at 20. Indeed, the district court itself relies on Mosley's testimony in its summary judgment order. R-95 at 3-4 (at least four separate citations to "Doc. 67," which is Paul Mosley's deposition). Thus, the Hickses have properly cited and rely on Mosley and Tandy's testimony in this Reply Brief, just as they did in their Principal Brief with objection from Ports America. *See, e.g.*, Hickses' Principal Br. at 6 n.7.

Q. Same thing on this particular day, you don't have any reason to believe that Ports America disposed of their need for the sort of plans we talked about earlier, to make sure their cargo's discharged or loaded efficiently and effectively, right?
A. Right.

Q. **That helps make sure Ports America gets their work done on time?**
A. **Yes**.

R-66 (Middleton Dep.) at 139-40 (emphasis added).

Ports America also argues that "[i]t did not know [Middleton] was scheduled to work the ship." Ports America's Br. at 17; *see id.* at 9 (claiming "it had no knowledge that the tortfeasor ... was assigned to its operation").

But, like with Ports America's payment argument, how and when Ports America learns the *names* of its employees is not dispositive in determining when an employment relationship begins. Ports America cites no authority, at all, that an employer must know the name of its employee before an employment relationship begins. Again, whether the employer has *control* over the employee and whether the employer receives a *benefit* are the main tests for employment. Neither test requires that the employer know the name of its employee in advance.

In any event, a jury could find that, by imputed actual knowledge or constructive knowledge (or both), Ports America knew Middleton's name, even before he was to report for on-ship duties at 1:00 p.m.

Regarding actual knowledge, there is testimony that the headers at the ILA

1414 union hall act as *agents* for the stevedoring companies. *See* R-67 (Mosley) at 15 ("[T]he company assigns the headers ...."); *id.* at 16 ("[T]he header, which is the foreman for the company .... walks down the aisle ... and they hire the individual who wants to go to work with them."); R-69 (Tandy) at 25 ("[O]ur hiring hall has hiring agents that are an extension of the shipping companies and once we're hired at the hiring hall then we are actually employed by the shipping company ...."); *id.* at 34 ("This is a dispatch sheet that comes from the hiring center and the business agents from the hiring hall, the ILA hiring hall.").

From that testimony, the jury could find that, when Ports America's header for that day, Al Stephens, hired Middleton to work the two-person gang, Stephens was serving as Ports America's agent and, thus, his actual knowledge was imputed to Ports America at that time. *See, e.g.*, O.C.G.A. § 10-6-58 ("Notice to the agent of any matter connection with [their] agency shall be notice to the principal.").

Regarding constructive knowledge, the hiring decisions made at the union hall are entered into a computer database, and once entered, those decisions are effective immediately. *See* R-67 (Mosley) at 17 ("Then once the cards are put in the computer system, immediately that person is considered hired for the particular – whichever company it is."); R-67 (Mosley, Ex. 4) at 124; *id.* at 41 ("And Exhibit 4 is the dispatch sheet for Mr. Middleton, correct? A. Yes, sir.").

The header also brings, before the start of on-ship duties, a printed copy of

the hiring decisions to the vessel. *See* R-71 (Ports 30 (b)(6)) at 13 ("[T]he hall makes printouts of what position each man would be. And that is brought to the vessel to be used to check off who shows up for the vessel by the timekeeper."); *Id.* at 15-16 ("For a start of the vessel, the superintendent is going to bring that paperwork out probably 12:30-ish, so they can know that it's ready and in place when the gang boss blows the whistle at 1 o'clock.").

From that testimony, the jury could find that Ports America knew or should have known that Middleton was its employee, at a minimum by 12:30 p.m., when a printed copy of the hiring decisions was brought to the Hyundai Loyalty, and thus Ports America should have known of Middleton's name before the collision.[6]

In sum, a jury could properly find that Middleton was Ports America's employee at the time of collision. The same evidence that Middleton was within the scope of his employment at the time of the collision is also evidence that Middleton was employed by Ports America at the time of the collision.

## 2.    A jury could find that Middleton's commute ended once he was inside the Port and, thus, he was within the scope of employment.

In their Principal Brief, the Hickses explained that "the going and coming rule" is a general rule of the common law, and "[t]wo rationales exist to support the 'going and coming' rule." *Carter v. Reynolds*, 815 A.2d 460, 466 (N.J. 2003);

---

[6] A jury could find that Middleton did not enter the Port until around 12:37 p.m., when he was "approved to enter the port." R-66 (Middleton Dep.) at 96.

*see* Hickses' Principal Br. at 15 ("There are two reasons for this rule.").

"The first is that 'employment is suspended from the time the employee leaves the workplace until [they] return[,]'" and "[t]hat 'suspension' occurs because the element of 'control' is deemed lacking." *Carter*, 815 A.2d at 466. "The second is that the employer derives no benefit from the commute." *Id.* "One commentator has explained that the purpose that underlies the going and coming rule is that 'it is unfair to impose unlimited liability on an employer for conduct of its employees over which it has **no control** and from which it derives **no benefit**.'" *Id.* at 467 (emphasis added). "In essence, when employees travel to or from work they are deemed to be acting in their own interests without constraints by the employer regarding the method or means of the commute." *Id.*

The Hickses then explained why, applying those two rationales for the going-and-coming rule, a jury could properly find that Middleton's commute ended once he entered the Port. Hickses' Principal Br. at 15-21.

In response, Ports America does not point to any authority from Georgia, nor any other jurisdiction, that explains where precisely an employee's commute ends, especially where that employee's jobsite is a multi-acre, tightly controlled area.[7]

---

[7] That this case involves a question of first impression is one of several reasons why this Court should hear oral argument. *See* Hickses' Principal Br. at i-iv. And Ports America's response that "[t]he facts read like a first-year law school torts exam" only reinforces why oral argument should be granted. Ports America's Br. at ii. The fact patterns for torts exams in law school are the *hardest*—not the

Instead, Ports America makes arguments that only raise disputed fact questions, involve questions about which inferences should be drawn, or require weighing various facts against each other—all things only a jury is allowed to do.

For example, Ports America argues that it "only required that Middleton report to the ship ready work [*sic*] by 1:00 p.m.," and "he could do whatever he wanted so long [*sic*] he reported on time." Ports America's Br. at 22.

However, as set forth above, *supra* Argument § 1.C., and throughout their Principal Brief, *see* Hickses' Principal Br. at 16-21, a jury could properly reject Ports America's assertion. A jury could find that, once inside the Port, Middleton was not free to do whatever he wanted until 1:00 p.m. Rather, Ports America required Middleton to complete certain pre-ship duties, and while engaged in one of those duties for Ports America's business, Middleton injured Mr. Hicks.

To restate that evidence, members of the two-person gang, like Middleton, "have to start their job duties for that particular job **prior to the start time**." R-67 (Mosely Dep.) at 80-81 (emphasis added). "You can't just get there at 1:00 ...." R-66 (Middleton Dep) at 139-40. Instead, Ports America imposes "those requirements" for pre-ship duties, such as getting the game plans, because "[t]hat

---

easiest—and they raise the types of questions that require an understanding and application of the underlying reasons for a rule to an undecided set of facts. *Cf. Carter*, 815 A.2d at 465 ("This highly indefinite phrase ... 'in the course of employment' is so devoid of meaning in itself that its very vagueness has been of value in permitting a desirable degree of flexibility ....").

helps make sure Ports America gets their work done on time." *Id.*

In particular, "picking up the gang plan is important to the cargo operation," R-67 (Mosley Dep.) at 72, because it lets Middleton "know how the ship is being loaded, what's being unloaded and the plans for the ship," R-66 (Middleton Dep.) at 138. "Ports America has those planned in advance, so the work can be done more efficiently ...." *Id.* "[I]f you get to the ship, and no one's got plans about the cargo on that particular vessel," "it's going to be less efficient." *Id.* at 139. Indeed, Middleton must "have a deck plan or a game plan." R-71 (Ports America 30 (b)(6) Dep.) at 15. "**[T]hat's his whole job**. He gets the paperwork, and he knows the layout of the hatch, meaning the hatch covers." *Id.* (emphasis added).

Thus, both rationales for the going-and-coming rule are absent once Middleton enters the Port. At that point, Ports America has *control*; it required Middleton to get the game plan, put on his PPE, and attend a safety briefing, all before on-ship duties at 1:00 p.m. And Ports America derives *benefits*; having Middleton complete those pre-ship duties makes the on-ship duties more efficient.

Meanwhile, Middleton lacks control. Middleton does not choose where the game plan is located, he does not choose whether he wants to wear PPE, and he does not choose whether he needs to attend a safety briefing. Those are all things that Ports America requires Middleton to do. And Middleton does not satisfy those requirements for "'purely personal reasons'" or for reasons "'entirely disconnected

from'" Ports America's business. *Coe v. Carroll & Carroll, Inc.*, 709 S.E.2d 324, 331 (Ga. Ct. App. 2011). He does so to serve Ports America's business.

Ports America also argues that it "does not control the Port; the Georgia Ports Authority ('GPA') does." Ports America's Br. at 21. "The GPA sets the rules and regulations governing who can enter and how." *Id.*

But the point of those limitations—such as the fact that Middleton cannot choose his mode of transportation within the Port and that, if Ports America had terminated Middleton's employment, he would not be allowed inside the Port—is not who sets them. The point is that these limitations confirm that, once inside the Port, it's all business (to borrow a phrase). Once inside the Port, Middleton can *only* do things that have some connection Ports America's business.

On a regular commute, such as the one Middleton made from the ILA 1414 union hall to the Port, Middleton could stop for coffee at Starbucks, buy a hamburger at McDonalds, and could bicycle to the Port if he wanted. Those are things that, by themselves, would be within Middleton's control and for his purely personal benefit. But, once inside the Port, Middleton could not do the types of purely personal things that one can do on a regular commute. Once inside, the Port's limitations necessarily mean that Middleton can only do things that have at least some connection and serve some benefit to Ports America's business. That is the point of GPA's limitations—they limit you to *business* activities.

Finally, Ports America argues that, "[e]ven if Hicks is correct that obtaining the game plan serves Ports America's business, Middleton never did so." Ports America's Br. at 22. He "was still on his way to picking up the plans." *Id.* at 23.

Yet, that argument fundamentally misunderstands the nature of the scope-of-employment analysis. The question is not whether Middleton did serve Ports America's business; the question is whether he was *trying* to do so. After all, an employee that causes a collision would never be serving their employer's business, and the number of motor-vehicle cases where truck drivers were "on [their] way to picking up [cargo]" would all have to be overruled if Ports America were right. *Id.*

Of course, that is not the rule. An employer "rarely commands [an employee] to be negligent, or employs [them] with the expectation that [they] will commit a negligent or willful tort; but if the act is done in the **prosecution** of the [employer's] business—that is, if the [employee] is at the time engaged in serving [the employer]—the latter will be liable." *S. Grocery Stores v. Herring*, 11 S.E.2d 57, 59 (Ga. Ct. App. 1940) (emphasis added).

That is precisely what happened here. Middleton was in the prosecution of Ports America's business—*i.e.*, he was trying to serve Ports America's business—when he was going to pick up the game plans. That he was unsuccessful does not change the fact Middleton was still engaged in serving Ports America's business.

**3.    Even if Middleton's commute continued inside the Port, a jury could find that, because he was getting his game plans, he was within the scope of employment.**

In their Principal Brief, the Hickses explained that there is an exception to the going-and-coming rule known as the "special circumstances" exception in Georgia and the "incidental benefit" exception in other jurisdictions. Hickses' Principal Br. at 21-25. Regardless of the label, the exception means the same thing.

Where an employer receives a special benefit "not common to commute trips by ordinary members of the work force," an injury that arises even during a commute is still within the course of employment. *Huntsinger v. Glass Containers Corp.*, 99 Cal. Rptr. 666, 670-71 (Cal. Ct. App. 1972); *see also Patterson v. Se. Newspapers, Inc.*, 533 S.E.2d 119, 121 (Ga. Ct. App. 2000) ("This benefit would not result from ordinary commuters ...."); *Jones v. Aldrich Co., Inc.*, 373 S.E.2d 649, 651 (Ga. Ct. App. 1998) ("Where the employee, before or after customary working hours, is on [their] way home after performing, or on the way from [their] home to perform, some special service or errand or the discharge of some duty incidental to the nature of [their] employment ... and an injury arises en route ... such injury is considered as arising out of and in the course of the employment.").[8]

---

[8] While Ports America is correct that the facts of *Patterson* and *Jones* involved the special-mission exception, the reasoning in those cases is *not* limited to the special-mission exception. There is no principled reason why *Patterson's* statement that "[t]his benefit would not result from ordinary commuters" would not also apply to explain the special-circumstances exception. 533 S.E.2d at 121. And

The Hickses then explained why a jury could properly find that the special circumstances exception applies here. "[E]ven though he was not 'on the clock' and being paid for his time," Middleton was driving to a dock house to get game plans "that would assist [him] in fulfilling his duties [on the ship]." *Clo White Co. v. Lattimore*, 590 S.E.2d 381, 382-83 (Ga. Ct. App. 2003). Thus, a jury issue exists as to whether, even while commuting, Middleton was engaged in Ports America's business—getting the game plans—when he drove his pickup truck into Mr. Hicks.

In response, Ports America says that "Hicks cannot point to any work-related task he[9] was performing while commuting. At most, he was driving on his way to complete such tasks." Ports America's Br. at 28.

Yet, once again, Ports America makes an argument that fundamentally misunderstands the nature of the scope-of-employment analysis. When Middleton is driving within the Port to pick up the game plans, he is not commuting to the dock house so that he can *then* perform a pre-ship duty required by Ports America.

Middleton's driving to pick up the game plans is *itself* part of the pre-ship duties required by Ports America. In other words, the pre-ship duties Ports

---

*Jones's* statement of the law expressly addresses "some special service or errand **or the discharge of some duty incidental** to the nature of his employment." 373 S.E.2d at 651 (emphasis added). That later phrase "or the discharge of some duty incidental" is a reference to the special-mission exception.

[9] Presumably, Ports America uses "he" in this sentence to refer to Middleton—not to Mr. Hicks. The question is whether Middleton was within the scope of his employment—not whether Mr. Hicks was.

America imposed on Middleton were not simply having and reading the game plans. Those pre-ship duties included *getting* the game plans, and that is the "work-related task" that Middleton was performing when he was driving. Middleton's *driving* to pick up the game plans is itself a work-related task.

If that were not the rule, it would create absurd results and effectively overrule a long history of scope-of-employment case law. Consider, for example, *Davis Gas Co. v. Powell*, 232 S.E.2d 258 (Ga. Ct. App. 1976). In *Davis Gas*, "Whatley and Lamb were employees of Davis Gas Company," and "[t]hey had been instructed by Hamp Davis, their boss, to go to Harold Ivey's farm that afternoon to pick up wheels for a tobacco barn." *Id.* at 841. "They used the truck assigned to Cliff Whatley for this purpose," and Whatley kept the truck at "home at night." *Id.* On the way to pick up wheels from Harold Ivey's farm, and *before* they actually picked up the wheels, Whatley and Lamb got into a wreck. *Id.* at 842.

If Ports America's belief about the scope-of-employment analysis were correct, then Whatley and Lamb were not within their scope of employment. According to Ports America, "[a]t most, [they were] driving on [their] way to complete such [job-related] tasks," and they were simply "commuting" to Harold Ivey's farm, their job site for the day. Ports America's Br. at 28.

But that is not what the Georgia Court of Appeals held. Instead, *Davis Gas* correctly held that Whatley and Lamb were within the scope of employment, even

if they were "not taking the shortest or most direct route for the performance of the duties of [their] employment, or had stopped en route." 232 S.E.2d at 260. *Davis Gas* is correctly decided because, under those facts, the *drive* itself is part of the job-related tasks, and it is one above and beyond an ordinary commute.

The same is true here. Middleton's driving to pick up the game plans was above and beyond an ordinary commute to either the Port or the Hyundai Loyalty. If all Middleton was doing was delivering himself to the job site (another way of describing a commute), then Middleton would have just driven up to the Hyundai Loyalty and nothing more. Driving to pick up the game plans and then transporting the game plans to the Hyundai Loyalty was something Middleton did in the service of Ports America's business, and "[t]his benefit would not result from ordinary commuters." *Patterson*, 533 S.E.2d at 121.

Putting aside prior case law, consider the far-reaching consequences of Ports America's interpretation. If Ports America's belief were correct, then employers could simply task their employees with picking up and delivering endless amounts of supplies, cargo, or even people on their way to their jobsites (which could change daily). And when faced with any *respondeat superior* claims, the employer could defend itself by saying that, "[a]t most, [the employee] was driving on his way to complete such tasks," and any torts that occurred on the way to completing such tasks would be immune from liability. Ports America's Br. at 28. Such a

result would make a mockery of *respondeat superior* liability.

Meanwhile, and contrary to Ports America's assertion, the Hickses' position would not "eviscerate the general rule that an employee commuting to work is not in the course and scope of [their] employment." Ports America's Br. at 30.

The Hickses' do *not* argue that Middleton's commute itself served Ports America's business. Rather, they argue that Middleton's driving to pick up the game plans—a requirement imposed by Ports America—is a benefit that served Ports America's business *above and beyond* an ordinary commute. It's that simple.

**4.    Even if Middleton was going to the wrong dock house, a jury could find that he was within the scope of employment.**

Finally, it is worth emphasizing and making clear that Ports America expressly disclaims reliance on the district court's incorrect reasoning that Middleton had no work-related reason for driving to the dock house near CB8. *Compare* R-95 (MSJ Order) at 11 ("[T]here is no evidence that Defendant Middleton knew, was told, or otherwise had reason to believe that .... he needed to travel to CB8's adjacent dock house to obtain the plans.") *with* Ports America's Br. at 31 ("Middleton's belief about where he was supposed to report is irrelevant. Whether the ship was docked at berth 4 or elsewhere and the actual location of the game plan makes no difference ....").

Thus, based on Ports America's own concession, the Court should assume (and, of course, the evidence supports the assumption) that Middleton believed that

he was driving to the correct dock house to pick up the game plans.

## Conclusion

For those reasons, this Court should reverse the district court's summary judgment in favor of Ports America. Signature and certificate pages follow.

The Hickses submit this brief on September 5, 2023.

**/s/ Naveen Ramachandrappa**

Naveen Ramachandrappa
Ga. Bar No. 422036
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100
*ramachandrappa@bmelaw.com*

Brent J. Savage, Sr.
Ga. Bar No. 627450
Zachary R. Sprouse
Ga. Bar No. 276708
James H. Wilson, III
Ga. Bar No. 768450
SAVAGE TURNER PINCKNEY
SAVAGE & SPROUSE
Post Office Box 10600
Savannah, GA 31412
912-231-1140
*bsavage@savagelawfirm.net*
*zsprouse@savagelawfirm.net*
*jwilson@savagelawfirm.net*

*Attorneys for Appellants-Plaintiffs*
*Richard Hicks and Jocelyn Hicks*

## **Certificate Of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains a total of 5,602/6,500 words, excluding the parts of the brief exempted by Fed. R. App. P. 32 (f) and 11th Cir. R. 32-4.

This brief also complies with the typeface requirements of Fed. R. App. P. 32 (a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on September 5, 2023.

**/s/ Naveen Ramachandrappa**

## <u>Certificate Of Service</u>

I certify that, on September 5, 2023, I filed **Appellants-Plaintiffs Richard Hicks and Jocelyn Hicks' Reply Brief** with the Clerk of Court using the CM/ECF system, which will serve this document on the following counsel:

*<u>Attorneys for Appellee-Defendant Marine Terminals Corporation - East</u>*

Marc H. Bardack
Michael P. Freed
Elissa Haynes
FREEMAN MATHIS & GARY, LLP
100 Galleria Pkwy, Ste 1600
Atlanta, GA 30339-5948
*mbardack@fmglaw.com*
*mfreed@fmglaw.com*
*ehaynes@fmglaw.com*

Jason Pedigo
Phillip Thompson
ELLIS, PAINTER, RATTERREE & ADAMS, LLP
PO Box 9946
Savannah, GA 31412
*pedigo@epra-law.com*
*pthompson@epra-law.com*

*<u>Attorneys for Defendant Gregory Middleton</u>*

Craig Terrett
Joy Lee
CRUSER, MITCHELL, NOVITZ, SANCHEZ,
GASTON & ZIMET, LLP
275 Scientific Dr, Meridian II, Ste 2000
Peachtree Corners, GA 30092
*cterret@cmlawfirm.com*
*jlee@cmlawfirm.com*

**/s/ Naveen Ramachandrappa**

Certificate of Service Page